# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| AMSURG CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 3:10-00670 |
| ) | JUDGE HAYNES |
| ) | |
| FRANK D. PRINCIPATI, ) | |
| ) | |
| Defendant. ) | |

## **M E M O R A N D U M**

Plaintiff, AmSurg Corporation, a Tennessee corporation, filed this action under 28 U.S.C. § 1332, the federal diversity statute, against the Defendant, Frank D. Principati, a Pennsylvania citizen, for breach of contract and injunctive relief. In sum, Plaintiff's claim is that Defendant breached the restrictive covenants in Defendant's employment agreements.

Before the Court is the Defendant's motion to dismiss under Fed. R. Civ. P. 12(b)(6) and (2) or, alternatively, to transfer venue to the Eastern District of Pennsylvania under 28 U.S.C. § 1404(a) (Docket Entry No. 19), contending, in sum: (1) that Plaintiff's breach of contract claim fails to state a claim under Tennessee law because the restrictive covenants are unenforceable as unconscionable, overly broad, and lacking reasonable geographic or time limitations; (2) that Plaintiff's factual allegations fail to state a plausible claim for relief; (3) that the Court lacks personal jurisdiction over Defendant who works and resides in Pennsylvania where the alleged events occurred; and (4) that alternatively, this action should be transferred under 28 U.S.C. § 1404(a) to the Eastern District of

Pennsylvania where the controversy arose and the Defendant and key, material third-party witnesses reside.

In its response (Docket Entry No. 21), Plaintiff asserts, in essence: (1) that its claims for breach of contract and injunctive relief state plausible claims and that Defendant's motion attempts to decide improperly the reasonableness of the restrictive covenants; (2) that Defendant had significant contacts with Tennessee to justify jurisdiction in Tennessee; (3) that transfer of this action to the Eastern District is improper because witnesses and evidence are also located in Tennessee; and (4) that Plaintiff's choice of forum should be given significant weight given that the parties' agreement designates Tennessee law as the "governing law."

For the reasons set forth below, the Court concludes that Plaintiff has not demonstrated the existence of a <u>prima facie</u> case of personal jurisdiction over the Defendant because this controversy arose in Pennsylvania and under Sixth Circuit precedents, the Defendant's cited contacts here are insufficient to establish the jurisdiction of this Court.

## I. ANALYSIS OF THE MOTION

Plaintiff, a Tennessee corporation with its principal place of business in Nashville, is a healthcare company that partners with physicians and physician groups to provide expertise, support, and efficiency in the management of ambulatory surgery centers. (Docket Entry No. 35, Amended Complaint at ¶¶ 1, 6). Plaintiff develops, acquires, owns and operates ambulatory surgery centers in partnership with physician groups across the United States. Id. at ¶ 6. From approximately July 18, 2005 until April 30, 2010, Plaintiff employed Defendant, a Pennsylvania citizen, as one of three division presidents who reported directly to the senior vice president for operations. Id. at ¶¶ 2, 7.

As a division president, Defendant exercised management authority over a significant portion of Plaintiff's workforce in Pennsylvania. Id. at ¶ 8; Docket Entry No. 27, Exhibit G, Principati Affidavit at ¶ 8. Defendant also cultivated and maintained working relationships with employees under his direct and indirect management authority and gained valuable knowledge about the work habits, backgrounds, strengths, and weaknesses of those employees whose knowledge was unique and advantageous to Plaintiff. Id.

Defendant worked for Plaintiff for four and one half years in Pennsylvania. (Docket Entry No. 21, Principati Affidavit at ¶¶ 3, 22). Defendant has resided in Pennsylvania for the last twenty-two years. Id. at ¶ 2. Yet, as an AmSurg executive, Defendant traveled to Plaintiff's corporate headquarters in Nashville, Tennessee approximately once per month to conduct business on behalf of AmSurg and maintained ongoing contact by telephone and/or email with Plaintiff in Nashville. (Docket Entry No. 24, Billie Payne Affidavit at ¶ 4). Defendant, however, did not otherwise work in Tennessee. (Docket Entry No. 21, Principati Affidavit at ¶¶ 3, 22). Defendant was paid by Plaintiff in Pennsylvania and conducted all of his business for Plaintiff out of Pennsylvania. Id. at ¶ 23. Defendant's office with Plaintiff was in Pennsylvania, as were the majority of AmSurg employees who reported directly to the Defendant. (Docket Entry No. 27, Exhibit G, Principati Affidavit at ¶ 8).

On February 17, 2006, Plaintiff and Defendant executed the first of four non-qualified stock option agreements under which Plaintiff granted Defendant the right to purchase certain amounts of company stock at fixed rates subject to certain conditions. (Docket Entry No. 35, Amended Complaint, at ¶ 9). In exchange for this promise, Defendant agreed to the following:

> (b) **Non-Solicitation.** While employed by the Corporation [AmSurg] and for a period of two (2) years thereafter, [Principati] shall not, upon [his] own behalf or on behalf of any other person or entity, directly or indirectly – (i) hire or solicit to leave the employ of the Corporation any person employed by or under contract as an independent contractor to the Corporation ...

Id. at ¶ 9, Exhibit A.

On January 1, 2007, the parties executed a second stock option agreement, granting the Defendant additional rights to purchase certain amounts of company stock at fixed rates subject to certain conditions with the same non-solicitation terms of the prior agreement. Id. at ¶ 10. On February 15, 2007, and February 21, 2008, the parties executed, respectively, third and fourth non-qualified stock option agreements, granting Defendant additional rights to purchase certain amounts of company stock at fixed rates subject to certain conditions. Id. at ¶¶ 11-12. In exchange for the latter promises, Defendant agreed to the following:

> (b) *Non-Solicitation.* While employed by the Company and for a period of two (2) years thereafter, [Principati] shall not, on [his] own behalf or on behalf of any other person or entity, directly or indirectly – (i) hire or solicit to leave the employ of the Company or any of its Affiliates any person employed by or under contract as an independent contractor to the Company or any of its Affiliates . . .

Id. at ¶ 11, Exhibit C; ¶ 12, Exhibit D.

On January 11, 2010, Melissa Hunter with Kraft Search Associates, LLC ("Kraft"), an employee recruiting or "headhunter" firm in Nashville, Tennessee, emailed the Defendant, informing him about an open position for chief operational officer ("COO") at Physicians Endoscopy, LLC ("PE"), a Pennsylvania company that partners with physicians in the ownership and management of ambulatory surgery centers, in direct competition with Plaintiff. Id. at ¶¶ 18-19. In March 2010, Defendant contacted Hunter to discuss the possibility of working for PE as its COO. Id. at ¶ 20. On April 8, 2010, Defendant met with Paul Frankenburg, Kraft's President and CEO in Philadelphia,

Pennsylvania, and discussed the possibility of Defendant being hired by PE for the COO position. Id. at ¶ 21; Docket Entry No. 27, Exhibit G, Principati Affidavit at ¶ 7. The Defendant did not meet with Frankenberg in Tennessee to discuss the PE job opportunity. (Docket Entry No. 27, Principati Affidavit at ¶ 7). While discussing an open clinical position at PE, Defendant suggested that Frankenburg contact Sharon Morrison, who had worked under Defendant's direct supervision in Pennsylvania for three or more years, about that position. (Docket Entry No. 35, Amended Complaint, at ¶¶ 23-24).

In April 2010, Plaintiff and the Defendant agreed to terminate Defendant's employment and executed a "Separation Agreement and General Release." Id. at ¶ 13. Among other things, the separation agreement provides a payment to Defendant of $142,200 in exchange for his release of claims and certain other ongoing obligations to Plaintiff. Id. at ¶ 14. Section 3(B) of the separation agreement also provides that without Plaintiff's prior written consent Defendant will:

> refrain from contacting or speaking with any current employee, partner or physician associated with any ambulatory surgery center, physician practice or vendor affiliated in any way with the Company. The obligations in this Section 3(B) are a continuing condition of the Employee's receipt of the Severance Amount (defined below) that will not expire upon the Resignation Effective Time. If the Company determines that the Employee has violated the terms of this Section 3(B) at any time following the date of this Agreement, not only will the Company immediately convert Employee's status with the Company from "resignation" to "termination," but also the Company will consider any such violation to be a material breach of this Agreement that will permit the Company to recoup immediately, or refuse to pay, any amounts previously paid to, or otherwise payable to, the Employee hereunder.

Id. at ¶ 15, Exhibit E.

Plaintiff terminated Defendant's employment effective April 30, 2010. Id. at ¶ 17. Defendant's termination occurred in Tennessee when Defendant traveled here to discuss the terms

of his termination. (Docket Entry No. 24, Billie Payne Affidavit at ¶ 4). One or more of the agreements at issue in this action was finally executed by Plaintiff in Nashville. Id. at ¶ 6.

On May 18, 2010, Defendant emailed Hunter, suggesting Hunter contact Morrison who resided in Florida about the open clinical position, and provided Hunter with Morrison's email address. (Docket Entry No. 35, Amended Complaint, at ¶ 25, Exhibit F). Morrison was not a Tennessee citizen or resident when she worked for Plaintiff. (Docket Entry No. 21, Principati Affidavit at ¶ 20; Docket Entry No. 27, Exhibit G, Principati Affidavit at ¶ 10). On May 22, 2010, Defendant emailed Frankenburg, listing Morrison as a reference for the COO position at PE. (Docket Entry No. 35, Amended Complaint, at ¶ 28).

On June 8, 2010, Defendant contacted Kraft that he accepted PE's offer for the COO position. Id. at ¶ 32. On June 9, 2010, Morrison contacted Kraft that she accepted PE's job offer for the Director of Project and Clinical Development. Id. at ¶ 33. Defendant officially began employment with PE in Pennsylvania on or about June 28, 2010, and Morrison officially began her employment with PE in Pennsylvania on or about July 29, 2010. Id. at ¶¶ 35-36; Docket Entry No. 21, Principati Affidavit at ¶¶ 13-17.

## II. CONCLUSIONS OF LAW

Of the parties' contentions, the Court addresses first the jurisdiction issue. Plaintiff bears the burden of a prima facie showing of *in personam* jurisdiction. Theunissen v. Matthews, 935 F.2d 1454, 1458 (6th Cir.1991); see also CompuServe, Inc. v. Patterson, 89 F.3d 1257, 1261-62 (6th Cir.1996). When, however, a district court rules on a jurisdictional motion to dismiss made pursuant to Fed. R. Civ. P. 12(b)(2) without conducting an evidentiary hearing, the court must consider the pleadings and affidavits in a light most favorable to the Plaintiff. Id. at 1458-59. To defeat such a

motion, Plaintiff need only make a prima facie showing of jurisdiction, that is, some proof to support a finding of jurisdiction to avoid a motion to dismiss. Id. at 1458; see also Welsh v. Gibbs, 631 F.2d 436, 438 (6th Cir.1980).

In diversity actions, the Sixth Circuit "has articulated a two-step inquiry to determine whether a federal district court sitting in a diversity-of-citizenship case can exercise personal jurisdiction over a defendant: (1) whether the law of the state in which the district court sits authorizes jurisdiction, and (2) whether the exercise of jurisdiction comports with the Due Process Clause." Brunner v. Hampson, 441 F.3d 457, 463 (6th Cir. 2006) (citation omitted). See also Pickens v. Hess, 573 F.2d 380, 385 (6th Cir. 1978).

Tennessee's Long Arm Statute subjects nonresident persons to the jurisdiction of state and federal courts in Tennessee on any claim arising from:

> (1) The transaction of any business within the state;
> (2) Any tortious act or omission within this state;
> (3) The ownership or possession of any interest in property located within this state;
>
> * * *
>
> (5) Entering into a contract for services to be rendered or for materials to be furnished in this state;
> (6) Any basis not inconsistent with the constitution of this state or of the United States;
>
> * * *
>
> (b) As used in this section, "person" includes corporations and all other entities that would be subject to service of process if present in this state.

Tenn. Code. Ann. §§ 20-2-214(a) and (b). The Tennessee long arm statute is construed to grant jurisdiction only to the limits of Due Process Clause of the Fourteenth Amendment. Pickens, 573 F.2d at 385.

There are two types of personal jurisdiction: "specific jurisdiction" and "general jurisdiction." As the Supreme Court explained: "When a State exercises personal jurisdiction over a defendant in a suit not arising out of or related to the defendant's contacts with the forum, the State has been said to be exercising 'general jurisdiction' over the defendant." Helicopteros Nacionales de Columbia v. Hall, 466 U.S. 408, 414 n. 9 (1984). General jurisdiction involves contacts of "continuous or systematic nature." Third Nat'l Bank v. WEDGE Group, Inc., 882 F.2d 1087, 1089 (6th Cir. 1989). When a State exercises personal jurisdiction over a defendant's contacts with the forum, the State is exercising "specific jurisdiction" over the defendant. Id.

In Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-73 (1985), the Supreme Court outlined the factors for determining whether the District Court possesses personal jurisdiction:

> The Due Process clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful "contacts, ties or relations." By requiring that individuals have "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign," the Due Process clause "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.
>
> Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this "fair warning" requirement is satisfied if the defendant has "purposefully directed" his activities at residents of the forum, and the litigation results from alleged injuries that "arise out of or relate to" those activities.
>
> * * *
>
> Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant *himself* that create a "substantial connection" with the forum State. Thus where the defendant "deliberately" has engaged in significant activities within a State, or has created "continuing obligations" between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

8

471 U.S. 471-72, 475-76 (citations and footnotes omitted) (emphasis in original).

To be sure, "'some single or occasional acts' related to the forum" can support a finding of personal jurisdiction, but not if the "'nature and quality and the circumstances of their commission' create only an 'attenuated' affiliation with the forum." Id. at 475 n.18 (citations omitted).

In Southern Machine Co., Inc. v. Mohasco Indus., Inc., 401 F.2d 374 (6th Cir.1968), this Circuit summarized the governing principles in a three-part test for determining whether consistent with due process, personal jurisdiction may be exercised:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

401 F.2d at 381. The Sixth Circuit has held that "each criterion represents an independent requirement, and failure to meet any one of the three means that personal jurisdiction may not be invoked." LAK, Inc. v. Deer Creek Enterprises, 885 F.2d 1293, 1303 (6th Cir.1989).

As the Sixth Circuit later stated, "[t]he *sine qua non* of personal jurisdiction is the purposeful availment factor under which the defendant must 'purposefully avail[ ] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" Dean v. Motel 6 Operating L.P., 134 F.3d 1269, 1273 (6th Cir.1998) (quoting Burger King 471 U.S. at 475) (citation omitted). "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.'" Burger King 471 U.S. at 475 (citations omitted).

Plaintiff does not assert general personal jurisdiction, and the Court declines to address that issue. Farr v. Spatial Technology Inc., 152 F.R.D. 113, 116 (S.D. Ohio 1993) ("Nowhere in his memorandum in opposition does plaintiff argue that defendant is subject to the *general* personal jurisdiction of the Court. Similarly, in his surreply memorandum, plaintiff makes just passing reference to Ohio's general personal jurisdiction statute. Although, in light of the above facts, such jurisdiction may in fact here exist the Court declines to address that issue *sua sponte*.") (citations omitted and emphasis in original). Thus, the Court addresses only whether specific jurisdiction exists.

Defendant contends (1) that he did not "purposefully avail himself of the privilege of acting" in Tennessee merely because Plaintiff has executive offices here; (2) that Plaintiff's claim does not arise from events in Tennessee, but in Pennsylvania, including any contact with Morrison; and (3) that Defendant lacks a "substantial enough connection" to Tennessee because Plaintiff's executive offices are in Tennessee.

Plaintiff contends that Defendant entered into contracts with Plaintiff, routinely traveled to Nashville and was notified of his termination in Nashville. Further, Plaintiff argues its claims arise out of Defendant's former employment with Plaintiff and Defendant's breach of his contractual obligations. Finally, the parties' separation agreement designates Tennessee as the "Governing Law" and that Defendant should have reasonably foreseen as subjecting him to a Tennessee court for any dispute under that agreement.

As to the first prong under Southern Machine, the Court concludes that Defendant "purposefully avail[ed] himself of the privilege of acting" in Tennessee. Defendant was an executive employee of a Tennessee company, visited Nashville approximately once per month for business,

maintained ongoing contact by telephone and/or email with Plaintiff in Nashville, and the separation agreement contained a choice of law provision that Tennessee law governed any dispute under the parties' agreement. A choice of law provision alone is insufficient to establish jurisdiction, but such a provision "can 'reinforce [a] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there.'" Calphalon Corp. v. Rowlette, 228 F.3d 718, 723 (6th Cir. 2000) (quoting Burger King, 471 U.S. at 482). Given the totality of facts, the Court concludes that there was a reasonable foreseeability of litigation in Tennessee.

Defendant cites Calphalon[1] to support his lack of purposeful availment. In Calphalon, the plaintiff, an Ohio corporation, manufactured products that the defendant sold in several Midwestern States. Id. at 720. The defendants were a Minnesota-based corporation and Minnesota resident who did not own any real or personal property in Ohio. Id. The defendant was the exclusive manufacturer's representative for Calphalon in the states of Minnesota, Iowa, North Dakota, South Dakota, and Nebraska. Id. In addressing the purposeful availment prong, the Sixth Circuit concluded that "the district court correctly recognized that the mere existence of a contract between [Defendants] and an Ohio citizen for seventeen months [was] insufficient to confer personal jurisdiction over [Defendants]." Id. at 722. The Sixth Circuit emphasized that the focus is on "the *quality* rather than the *quantity* of the contacts" and on "the *quality* of the parties' relationship, rather than the *duration* of the relationship" to determine whether personal jurisdiction existed. Id. (emphasis in original).

---

[1] The Court notes that Defendant mistakenly refers to Rowlette as Calphalon's employee in his brief.

The Sixth Circuit classified the Calphalon plaintiff's contacts as "purely 'fortuitous' and 'attenuated' ":

> In this case, the agreement and previous association between Calphalon and Rowlette centered on Rowlette representing Calphalon in the states of Minnesota, Iowa, South Dakota, North Dakota, and Nebraska. Rowlette's performance of the agreement was not focused on exploiting any market for cookware in the state of Ohio. Moreover, Rowlette's phone, mail, and fax contact with Calphalon in Ohio and J. Rowlette's physical visits there occurred solely because Calphalon chose to be headquartered in Ohio, not because Rowlette sought to further its business and create "continuous and substantial" consequences there. Arguably, Rowlette would have served as Calphalon's representative in the designated states, regardless of Calphalon's base of operation. Thus, Rowlette's contacts were precisely the type of "random," "fortuitous," and "attenuated" contacts that the purposeful availment requirement is meant to prevent from causing jurisdiction.

Id. at 723. The Sixth Circuit further stated that "even though Rowlette was on notice that the contract was to be governed by Ohio law, it did not make a deliberate affiliation with that state nor could it reasonably foresee possible litigation there." Id.

Unlike the defendant in Calphalon who was an independent party who entered into a contract with the plaintiff, in this action Defendant was an executive employee with the Plaintiff. In In re Huffy Corp., 358 B.R. 724 (Bankr. S.D. Ohio 2006), the Bankruptcy Court distinguished Calphalon, stating:

> It is important to note that Rowlette was an independent contractor transacting all of its business outside of Ohio and was neither an employee nor subsidiary of Calphalon. It was a purely commercial arrangement by which an outside sales agent sold products produced by Calphalon and was paid commissions to do so. Rowlette's only flagrant availment of the privilege of acting in Ohio or causing a consequence in that state was the agreement itself which happened to be governed by Ohio law.
>
> Our case is very different. Finkelstein and Salter were not independent parties operating in Canada pursuant to a simple contract for sales and commissions. Finkelstein and Salter not only contracted with Huffy in the United States, they actually became part of Huffy. They fully embraced Huffy by becoming not just employees, but officers of Canadian and American subsidiaries. In addition to

profiting from the sale of Gen-X to Huffy, they contracted to enhance their wealth with Huffy stock options tied to their performance on behalf of Huffy. Their contracts contemplated a long continuing relationship with Huffy, a relationship they apparently thought would benefit them. Their activities as managers and officers were inexplicably bound to the American corporation and they accepted the benefits of American laws pertaining to corporate governance and securities. It should not have been a surprise to either of them that they might be haled into an American Court on matters pertaining to corporate asset transfers and fiduciary duties of officers.

Id. at 737-38; see also Krauss-Maffei Corp. v. Donovan, No. 07-99-DLB, 2008 WL 108757, at *6 (E.D. Ky. Jan. 9, 2008) (distinguishing Calphalon and concluding that "because Defendant herein chose to enter into an employment agreement that contemplated the continuing contact with the corporation's headquarters in Florence, Kentucky, it is difficult to accept that his involvement with the forum was not free and intentional. Moreover, Defendant's relationship to Kentucky cannot not [sic] be described as merely 'passive,' as Defendant has traveled to Kentucky for employment purposes and depended on Kentucky headquarters for administrative support.").

The Court concludes that Defendant's reliance on Calphalon is misplaced as Defendant's employment status as an executive employee and his monthly visits are distinguishing facts.

As to the second Southern Machine prong, the Court concludes that Plaintiff fails to satisfy this prong. "The 'arising from' requirement under the second prong is satisfied when the operative facts of the controversy arise from the defendant's contacts with the state." Calphalon, 228 F.3d at 723. "Only when the operative facts of the controversy are not related to the defendant's contact with the state can it be said that the cause of action does not arise from that contract." Southern Machine, 401 F.2d at 384 n.29. The Sixth Circuit has recognized that "a breach of contract action arises from the defendant's contact with the state because the contract 'is necessarily the very soil from which the action for breach grew.'" Calphalon, 228 F.3d at 724 (citation omitted). The Sixth Circuit has

explained that "if the actual breach does not arise from 'the very soil from which the action for breach grew,' the exercise of jurisdiction may still be deemed reasonable if, according to the third prong of the Southern Machine Co. test, the consequences of the act or breach caused by the defendant have a substantial enough connection with the forum state." Id.

Here, as in Calphalon, "the facts at issue did not occur in the forum state nor were the consequences of the breach substantially connected to the forum state." Id. Morrison was not located in Tennessee. Defendant and Morrison were hired by PE, a Pennsylvania company, and any alleged breach of contract occurred outside of Tennessee. Further, Plaintiff describes only that one or more of the agreements were "finally executed *by AmSurg* at its headquarters in Nashville, Tennessee." (Docket Entry No. 24, Payne Affidavit at ¶ 6). Plaintiff's proof does not show Defendant signing any contract in Nashville. In this context, some of the agreements were, presumably, finally executed in Pennsylvania or elsewhere. Thus, Plaintiff cannot show that Defendant had a substantial contact with Tennessee. See Buckeye Check Cashing of Arizona, Inc., No. 2:06-cv-792, 2007 WL 641824, at *11 (S.D. Ohio Feb. 23, 2007) (ruling that Ohio jurisdiction did not apply, the district court concluded, "As to the second prong, the basis for plaintiff's claims is the defendants' alleged violation of the non-competition clause of the Agreement by accepting employment with an alleged competitor in Arizona. Those claims arise from the alleged acts of the defendants in Arizona, not in Ohio.").

As to Southern Machine's third prong, the acts of the defendant or consequences of those acts must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable. Southern Machine, 401 F.2d at 381. To be reasonable, the exercise of jurisdiction must "comport with 'traditional notions of fair play and substantial justice.'"

Reynolds v. International Amateur Athletic Federation, 23 F.3d 1110, 1117 (6th Cir. 1994) (quoting Asahi Metal Industry Co. v. Superior Court, 480 U.S. 102, 113 (1987)). A court should consider the following factors:

> the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief. It must also weigh in its determination 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several states in furthering fundamental substantive social policies.'

Id. (quoting Asahi Metal, 480 U.S. at 113) (citation omitted).

The Court concludes that the third prong favors Defendant. Defendant is an individual defendant and as such would bear a heavier burden with travel and out-of-state litigation costs than the Plaintiff corporation. Defendant is a Pennsylvania resident-citizen who works for a Pennsylvania company. Defendant's prior work for Plaintiff was at Plaintiff's Pennsylvania office. The alleged breach occurred in Pennsylvania. Defendant also lists many potential witnesses, including Morrison, who have relevant information and those witnesses reside in Pennsylvania. (Docket Entry No. 27, Principati Affidavit). To be sure, Tennessee has an interest in providing Plaintiff, a Tennessee corporation, with a forum to enforce its contracts. Yet, Plaintiff's affidavit does not establish that the agreements were signed by the Defendant in Tennessee. Pennsylvania has an interest in seeing that such agreements are lawfully applied towards its citizens and companies. On balance of all factors, the Court concludes that these factors weigh in Defendant's favor. The Court concludes that Pennsylvania, the state of performance and effects, has the greater interest on whether the parties' agreements are enforceable.

For these reasons, the Court concludes that Plaintiff's claims should be dismissed for lack personal jurisdiction, but without prejudice to the merits of Plaintiff's claims. Accordingly, Defendant's motion to dismiss (Docket Entry No. 19) should be granted.

An appropriate Order is filed herewith.

**ENTERED** this the 25th day of February, 2011.

WILLIAM J. HAYNES, JR.
United States District Judge